The first case is Courthouse News Service v. Stites. And let me just make sure that Judge Chin is able to hear us okay. Yes, I can hear you fine, can you hear me? Absolutely, crystal clear. So, all right, Mr. Boyd, you have 10 minutes, but you've reserved three minutes for rebuttal, so that gives you seven out of the game. You may proceed. May it please the court, David Boyd on behalf of the appellants. Courthouse News has been litigating cases like this, circuit by circuit nationwide, for more than a decade. And every appellate court that has considered a timing demand like Courthouse News' has questioned or rejected it. This court should as well. After a two-year public deliberative process that included committee member input from members of the media, bench, bar, and the Vermont ACLU, the Vermont Supreme Court adopted rules designed to enhance the legitimacy of Vermont courts by promptly making filings available, while also protecting the people courts serve from serious known preventable harms. Whether the court approaches this case by applying abstention principles, through the experience and logic framework, by defining the scope of the access right Courthouse News claims, or by applying intermediate scrutiny, the ruling of the district court should be reversed. Because of my limited time, I would like to focus today on the district court's failure to properly apply the experience and logic burden shifting framework. The Third Circuit, the Delaware Supreme Court, and a leading First Amendment treatise have all recognized that that is the appropriate framework for applying the experience and logic test. The district court erred as a matter of law when it did not require Courthouse News to plead and prove a qualified right to access complaints prior to human review and faster than Vermont provides them. By failing to- Let me ask you a question. Vermont's procedures require counsel to inspect the complaints for violative material, material that shouldn't be there, and imposes penalties on counsel who would allow violative matter to be in the claim. Why didn't that essentially do it for counseled cases? I recognize that uncounseled cases are a wild card, but why is there any expectation if counsel are under this, not just the duty, but the threats to their ability to go on practicing law? I'm not sure whether there's a criminal component or not, but there are real threats there. Why doesn't that adequately take care of counseled cases in a manner that would obviate the need for a clerk to comb over hundreds and hundreds and hundreds or thousands, I don't know what the numbers are, of cases looking for needles in a haystack? Your Honor, the answer is that filers, whether intentionally or accidentally, regularly file information that they are not allowed to file under the rules. Counseled and uncounseled? Yes. Okay, and so I think you said 66 for over a six month period, I think, of the complaints involved violations, including person identifying information. How many of those were counseled and how many were uncounseled? So I think the immediate answer is I don't know what percentage were counseled versus uncounseled. In terms of the total numbers, I believe it was 66 or 68 that were rejected using a redaction code, indicating that it was confidentiality-based, and then another 72 that were rejected with comments, indicating that confidentiality was involved. It's possible for the reviewer- Has Vermont done anything aggressive about it, like, for example, wielded a threatening thing or, in fact, imposed a sanction on a lawyer who allowed it through to show the bar? We mean business about this? Sanctions can certainly be sought in any individual cases. Yeah, I'm asking whether Vermont has done it, because if you treat the availability of sanctions as something that's just there in writing but doesn't mean anything, lawyers will perhaps be careless about it. But the first time you act threatening about it or impose a sanction on somebody who allowed something to go through, then lawyers will recognize that it's for real. Your Honor, I'm not aware of specific cases sanctioning lawyers for confidentiality breaches, but I will say the problem here is essentially filer mistakes, and the interim effect of sanctions is not going to categorically preclude mistakes, and you can really see that in the PACER data. A federal judicial center report found 1,896 unique, non-exempt, unredacted Social Security numbers in federal district court filings in one month alone. That suggests 22,000 people are exposed every year in the federal district courts, and the federal district courts handle a tiny fraction. Talk about nationwide? Yes. Although the federal district courts handle a very small fraction of civil and criminal litigation nationwide. So the best evidence of the scope of the potential harm here of Courthouse News' campaign to change the traditional human review practice of state courts is a multiple of that figure. Likely hundreds of thousands. Mr. Board, I have a question. Didn't the district court find that there was only a tiny fraction, less than a tenth of 1% of complaints that contained confidential information? Yes, Your Honor. The district did find that the overall percentage was low. I would note in that regard, it doesn't seem to be a particularly serious problem. So Your Honor, again, I think the scope of the problem is, I think the district court took the wrong frame of reference when it looked solely at civil complaints. It also erred when it counted two initial civil filings. There were three documents that filers identified as initial civil filings that were rejected on confidentiality grounds. And I view the proper scope of the case as civil filings generally, because Courthouse News does not have a unique right of access to civil complaints only. And the proper scope as nationwide, because Courthouse News is seeking to change the access practices of state courts nationwide. Well, I thought your answer was gonna be that that's a really small problem unless it's your personal identifying information that ends up being disclosed. And then it's a pretty big problem because it's out there. And Your Honor. But you didn't say that. And Your Honor, I agree as well that that is also an answer. The two answers are one, the scope of the problem is much larger than the district court viewed it as. And two, any breach of that kind can be very harmful as the district court in the Cozine case recently mentioned when it observed that exposing the identity of an abused child or the location of a domestic violence victim are the kinds of things that can cause serious harm to litigants. I didn't understand the part of your answer that was not the one that Judge Sullivan suggested. The other part of your answer. Can you explain that again? I didn't catch what you're saying. Yes, Your Honor. The district court focused only on initial civil filings. And we respectfully submit that that is taking too narrow a view of the problem because Courthouse News does not have a unique First Amendment right only to civil complaints. The proper scope of analysis should be all civil filings. And because Courthouse News is seeking to change the access practices of state courts nationwide, the court should be looking at the problem from the perspective of a multiple of the PACER data, likely hundreds of thousands of exposures of non-exempt. This lawsuit is about initial civil filings, isn't it? Isn't that what Courthouse News is asking for is for immediate access to initial complaints filed in civil cases? Yes, Your Honor. The point about the broader harm that I'm attempting to make here is that Courthouse News' right is not unique to civil filings. If Courthouse News demands access to civil filings, a subsequent group, sorry, to civil complaints, a subsequent group could demand access to civil filings generally. And that type of access could be demanded nationwide. So the proper scope of the problem is looking at civil filings generally and looking at what would happen if Courthouse News' nationwide campaign was successful nationwide. I still don't get it, but maybe I never will. I thought we were talking about what this case is about. I mean, of course, when you get into depositions and things like that, that opens up whole new areas of concern and whole new likelihoods of things getting, becoming accessible. But that's not what we're talking about in this case. And Your Honor, looking very narrowly only at initial civil filings, the percentage rejected in Vermont is about four times the percentage that the Cozine District Court just found significant applying the PLANET framework. And we would respectfully submit that even with the lens that narrow, Courthouse News' position is incorrect here and the court should reverse and remand. And I see that as my time. Judge Chin, did you have any other questions? No, I'm fine, thank you. All right, so Mr. Boyd, you've got three minutes for rebuttal. We'll hear now from Mr. Myers. Good morning, Your Honors. Roger Myers of Brian K. Bladen-Paisner on behalf of the Plaintiff's Annapolis Courthouse News Service, the Vermont Press Association, the New England First Amendment Coalition, Gannett, Vermont Publishing, and a host of other Vermont media. I wanna start with the point that we left off on there, which is that the actual, the delays, the, excuse me, the amount of confidential filings that got through was correctly found by the district court to be less than one half of one one hundredth of 1%. Okay, but why is 66 people having their personal identifying information out there? Well, the 66, excuse me, Your Honor, the 66 is not complaints. The 66 was all civil filings. And it's not out there. They just flew, they somehow got through the e-filing interface, which requires someone to go through and check a box that says, I've taken all confidential information out, and then were in the queues when they were reviewed. That doesn't mean the information got out there. All right, but you're saying. There's been no evidence presented that anyone's private information was ever published. And in fact. But that's because they, they're doing a process. Well, they were, but since the injunction in this case, they haven't been. And they haven't come in and asked the court to take judicial notice of any instances where confidential information got through because there wasn't pre-access review happening. And again, it's not the 66, the court's correct that this case isn't about all civil filings. The First Amendment right of access analysis goes proceeding by proceeding and record by record. And in this circuit, the Second Circuit's already held in Bernstein that there's a First Amendment right of access to complaints. So we're talking only about complaints. And with respect to complaints, we're talking about two complaints out of 4,156 where some sort of confidential information got through the e-filing interface. So your view of that is that's an acceptable rate? It is because it doesn't mean. So what's the ceiling of the acceptable rate of people? I mean, I assume you don't want your personal identifying information out there, but what's acceptable for other people? So, Your Honor, depending on what level of scrutiny you're applying, it either has to be a substantial probability that there's gonna be harm to the interest of confidentiality that will occur if immediate access allows. That's the Press Enterprise 2 standard that the Ninth Circuit applied in Planet 3. Or it's a time, place, and manner standard, which still requires a genuine, the Supreme Court in Turner Broadcasting, the must-carry case, spoke directly to this. The government had evidence that 20% of the time, cable companies were dropping or not carrying local TV station, 20%. And before must-carry was imposed, requiring them to carry the local TV stations. And the Supreme Court said that's not enough. It's not enough to posit the possibility of a disease that needs a cure. You need to show there's actual harm happening. So I have a couple of questions. And there's, yes, sure, Your Honor. In two parts or more. First of all, I'm not sure I understand why there's a need for an injunction in a case like this where the suit is brought against state officials and court officials particularly. First of all, why wouldn't a declaratory judgment, at least as an initial proposition, unless the state turned out improbably to flout the declaratory judgment and ignore it, why isn't the declaratory judgment adequately sufficient? Because even if there's no cause for abstention, still federalism, federalist interests have a role and respect for the jurisdiction of the courts of the state it seems to me are a consideration to be taken into account by the federal courts. But moving to the second part of the question, it seems to me this injunction went off the fall much farther than it needed to because why wouldn't it be sufficient and indeed much preferable simply to say that in a declaratory judgment or if it's an injunction either way to say that the present practice is illegal, the present practice violates the First Amendment without strangling the opportunity for the state to work out something that would work better? Why wouldn't it be perfectly adequate to issue either an injunction or I think better yet a declaratory judgment saying you can't go on doing what you're doing but you can work out something that will do a better job of screening out these things and let Vermont come up with a procedure like if it added teeth to the threats maybe if it imposed criminal sanctions on lawyers who allow inappropriate matter to be revealed? Well, Your Honor, there's no... Here the state is foreclosed from doing anything other than just dropping any approach to screening that would require any delay whatsoever even if it were a one hour delay. Well, Your Honor, I think part of the problem is the rules in Vermont do not provide for pre-access review. It's an interpretation of the rules that's been put on it by the appellants. So in crafting an injunction, the district court said I'm not gonna enjoin all the rules. I'm not gonna enjoin the other things they're doing. I'm not even gonna enjoin their review of the complaints. They can do all of that. The only thing they can't do... Can't do any delay. No, the only thing they can't do is seal everything for as long as it takes for them to get to the complaints and review them which is what they've been doing. They had been sealing every single complaint. Everything immediately available without any delay. Well, so under this court's decision in Lugos, once there is a right of access attaches, there is a presumption of immediate access that attaches. I'm correct. Let's get this understood. Am I correct? I am, am I not? That if Vermont imposed a 15 minute delay, that would be violative of this injunction? Not if they justified it, your honor. First of all... What do you mean? Where does it say not if they justified it? Well, so would it be violating the injunction? If they were doing... If they were taking the 15 minutes to do pre-access review, yes. But remember, that's a less restrictive alternative as well. If they can do review within 20 minutes of a document flowing into the publicly accessible queue, if something gets through, they can pull it back. We're talking about two complaints out of 4,156. We're talking about access to a public terminal at the courthouse, not online. Why isn't it an excessive restraints to say Vermont cannot adopt any procedure that would involve even a minute of delay? Well, I think, your honor, if you issue a declaratory relief like that or an injunction crafted like that, now you start to run into the Rizzo issues. Because now you're telling a court how quickly they have, or a clerk's service, clerk's office, how quickly they have to process. No, the court is not telling Vermont how quickly it has to do everything. It's allowing Vermont an opportunity to improve from the point of view of your clients, improve from the point of view of your clients what's happening without telling them that they can't impose a delay of even a minute. Your honor, I don't read the decision as saying you cannot impose a delay. I read that the injunction is saying simply, they're enjoined from holding complaints and sealing complaints until they've conducted their pre-access review. Well, if they did that and it took a minute, that would be a violation? If they did that before allowing access, it would be a violation. If something else happened that prevented a complaint from flowing through to a publicly accessible terminal at the courthouse, it would not be. But if they were to violate the court's order and go ahead and do pre-access review anyway, it would violate it. But again, I come back to, under either Press Enterprise 2 scrutiny or time, place, and manner scrutiny, there's a less restrictive alternative here, which is that if they can do their review in 15 or 20 minutes, it flows into a publicly accessible terminal. It's there for the press if they want to review it. It seems to me what you're saying is that the less restrictive alternative is to allow them to pull it back after it's been publicly reviewed. After it's in a computer terminal where somebody could conceivably see it, yes. But we're talking, Your Honor. Is there a famous saying about that, something to do with a cow getting, after the cow has left the barn? But I think we have to come back to the fact we're talking about two complaints out of 4,156. And I think the court was correct to use the needle in the haystack analogy. You're basically sealing everything, all 4,100 complaints, so you can find the two needles in that haystack that might have some sort of confidential information in it. Well, but because the consequences are dire if it gets out, it's potentially dire, right? But there's no evidence of that happening. This, I think you were coming back to, again, what the Supreme Court said in Turner Broadcasting. You can't just posit the existence of a disease that you want to cure. You've got to actually show that there's harm happening. There has to be some sort of measurable harm. I thought you conceded that there were at least several instances in which public information was disclosed in complaints. There were two instances out of 4,156 in which some sort of information that was designated as confidential, non-public, we don't know what it was, got through the e-filing interface. And I guess what I'm saying is that is simply not enough to meet the quantum of proof required by either the press enterprise due test or by the time, place, and manner test as applied by the Supreme Court in Turner Broadcasting. And with respect to the immediate access issue. This is two out of 4,156 when the screening process was in effect. But it was the screening process that caught the two. The 4,156 went through the e-filing interface. 4,154 of them, any confidential information was effectively screened out of the public filings. Only two of those got through the e-filing system to be caught by the clerk's review. And at the end of the day, the First Amendment really doesn't allow sealing of records. All of the complaints with no deadline so they can remain sealed for three, four days or more in order to find some sort of non-public information in less than, you know, in 0.048% of the complaints, which is what the district court found. And they haven't, they're trying to use a different number by using all civil filings. But all civil filings aren't at issue. What happens in other states or in Pacer isn't at issue. Remember, in New York and Connecticut, there is no delay now in the e-filing courts. It flows automatically through to the publicly accessible terminals. We've had no reporting of there being significant problems with private information getting out. They just haven't, they haven't carried their burden under either test. And I do want to come back to something on the immediate access point. As I was reviewing cases this weekend, I realized that Judge Sullivan, you authored a case back in 2016, even before Bernstein. They had raised the question about whether Lugos applies to complaints. You applied it to a complaint in a case called Doe versus Berg, which involved a plaintiff who wanted to proceed anonymously and then she wanted to, there was some issues with her complaint and you reminded her that the strong presumption of immediate access in Lugos would apply to her complaint. That's a, that case is- I think Lugos stands, I think the language of Lugos is pretty clear. Agreed. And I guess your argument is that that's what distinguishes the Second Circuit from the other circuits that have adopted a time manner. No, so no, actually, I'm glad you raised that, Your Honor, because I wanted to come back to that. There's been some confusion about what the standard was that was applied by the Ninth Circuit in Press Enterprise 3. The Ninth Circuit applied, I'm sorry, in Planet 3. The Ninth Circuit applied Press Enterprise 2 scrutiny. It mentioned that delays resembled time, place, and manner restrictions, but in Footnote 9, it expressly rejected the argument that time, place, and manner analysis should apply. There's been some confusion. I think the appellants have been confused in reading the Ninth Circuit's decision by that. But if you go back and look at it, you'll see the Ninth Circuit clearly said time, place, and manner does not apply here. That's in Footnote 9. And they applied the Press Enterprise 2 test, which requires a substantial probability that the interest and confidentiality will be harmed by immediate access. That's the first part of the test. And then, even if so, they have to show that no reasonable alternatives exist that would protect the interest. And the fourth, sixth, and tenth. So the sixth hasn't ruled on, if you're talking about the Barth case, that was a footnote in an unpublished decision, an asterisked footnote in an unpublished decision in the sixth, I think, that I don't think really stands for the proposition. The Tenth Circuit, so in the Fourth Circuit, the Schaeffer District Court said I should apply Press Enterprise 2 scrutiny. But then it misread Planet. It misread the Ninth Circuit's decision as applying time, place, and manner. So it applied both. And then the Fourth Circuit simply did the easy thing and affirmed on time, place, and manner grounds because the appellants couldn't meet either test. The Tenth Circuit says at one point in its decision that once you find a right of access and a presumption of immediate access, then the burden shifts to the appellants to show that there is an interest that overrides that presumptive right of access under the Press Enterprise 2 test. They then later went on and talked about time, place, and manner too. But they did recognize that the Ninth Circuit had applied Press Enterprise 2 scrutiny. So I do think it would be helpful if this court writes on this issue. It doesn't have to because they can't meet either time, place, and manner or Press Enterprise 2. But it would be helpful to clarify this. Well, I thought you were suggesting that Lugosz sort of has already set the course for the Second Circuit. It has set the course. I was just pointing out that the other circuits don't stand for the proposition that they're somehow different than Lugosz. Remember, the Ninth Circuit said the defendant had to show a substantial probability that their interests would be harmed by immediate access. They use the same immediate access standard. Once there's a right of access and once it attaches at submission, then under a whole host of case, some of which are cited in Lugosz, the presumption is that there's an immediate right of access. It's only a presumption. It can be overcome. But to overcome it, they have to meet the second part of the Press Enterprise 2 test. And to, again, I'll just submit, I understand the concern about, you know, isn't one enough? If somebody's information gets out there and it's yours, wouldn't you feel that that's not enough? But it's not enough for constitutional scrutiny. It's not enough to sacrifice First Amendment rights to everything else. I mean, and I come back to if in Turner Broadcasting, under time, place, and manner analysis, if the Supreme Court said 20% of the time isn't sufficient, then I simply can't believe that under either time, place, and manner. It's a very different case. It is a very different case. We're talking about a delay here. I'm just talking. Maybe a day, maybe less than a day, maybe a couple of hours. And you're taking an absolutist position, it seems to me, that says even a minute is too much, right? No, if we wouldn't have, the lawsuit would not have been filed if the delay was a few minutes. The lawsuit was filed because there was no deadline at all for them to do their review. And so it was taking several days. And 20% of the time, it took at least three or four days or more. That's at the time of the filing. And now it sounds like it's proved. They sped it up. But for the same reasons that that doesn't moot the case, that goes to why there's a need for an injunction. Without an injunction, there's nothing to prevent them from sliding back. In addition, the 67% doesn't meet constitutional scrutiny either. In Tingling, Judge Ramos found the- When you're, I'm not talking about no injunction and nothing. I was talking about a declaratory judgment in place of an injunction. And if the declaratory judgment is not being respected, if clerks are simply taking a long time in spite of a declaratory judgment that makes what they're doing illegal, then the next phase is an injunction. So the district court did that in Schaefer, Your Honor, because there, the courts had gotten up above 90% same-day access with their review. And the courts found that that was constitutional, that that was within constitutional limits. The problem here is that even after they sped up, after the preliminary injunction motion was filed and they sped up and were able to get to 67%, that actually was slower than one of the courts, one of the courts in Schaefer. I think it was Prince William, in four of the six months before the lawsuit was filed in that case, they had access of 64% six days, 67%, 68 or 69, and 70%. And the district court there found that was unconstitutional. So I think, and the problem with not having an injunction, I think two things about that. One, without an injunction, they can slide back. You know, if they don't have something that says here's your line, you can't cross it. There's nothing. The difference between an injunction and a declaratory judgment. And the other thing with respect to the federalism concerns that Rizzo and then Gilmour raised, I think that applies more with mandatory injunctions. When you have an injunction that says you have to do certain things by a certain time, that starts to raise potential federalism issues. And that starts to impose a bigger burden on the state agencies involved. When you simply- Well, we've gone way over, but let me see if Judge Chin has any questions. I'm fine, thank you. Okay. Thank you, Your Honor. Let's stop there and we'll give Mr. Boyd his three minutes of rebuttal. Thank you, Your Honor. Just wanted to briefly address a few of the questions that were raised earlier. Starting with the comedy concerns associated with the injunction. The district court here enjoined rules adopted by the Vermont Supreme Court. There's no question that they require pre-access review. Courthouse News recognized that in writing before the rules were adopted. It specifically objected that they place redaction responsibility on intake clerks. And district court also categorically divested the Vermont Supreme Court of authority to promulgate any alternative pre-access review no matter how fast. The discussion of timing that followed that question highlights that Courthouse News is asking this court to make a decision in a vacuum because it did not carry its burden of establishing the qualified right it claims. The experience and logic framework requires what courts nationwide have traditionally provided. By not addressing any courts in 40 of the 50 states. What about Lugash? I mean, we've covered some of this ground already, right? So Lugash used the words immediate, quickly, and contemporaneous when remanding for a process likely to take several weeks or months. It was a privileged review by a court of a 15 volume sealed appendix. It does not stand for the prospect that instantaneous access should be required or that pre-human review access should be required. It contemplated human review after adversarial briefing. In terms of the standard that should be applied here, every appellate court that has heard a Courthouse News case has found that the answer is not strict scrutiny. And as Judge Sullivan observed in the 2009 case of NYCLU versus New York Transit Authority, the second half of Press Enterprise is strict scrutiny. That is not the correct standard because Press Enterprise was an access denial case. It was closure of preliminary hearings. The correct standard is intermediate scrutiny and we respectfully submit that the proper framework is that set forth in Turner and O'Brien. That is the intermediate scrutiny standard that applies in most areas of First Amendment law where intermediate scrutiny applies. And Globe and Richmond newspapers, the confusion arises from them indicating that strict scrutiny does not apply to practices that resemble time, place, and manner restrictions, but that listing scenarios ranging from access to a prison to time, place, and manner restrictions and several other non-strict scrutiny areas that are not time, place, and manner restrictions. So we would respectfully submit that the O'Brien and Turner framework is what makes the most sense without modification in this context. All right, but I mean, if the state's process said, okay, we'll take a week to review these complaints to figure out whether they have personal identifying information, would you agree that that would be too much? If courthouse news showed that courts traditionally made complaints available faster, then yes, that would be violating a presumptive right. Well, traditionally, like when? From 1892 or traditionally from the advent of electronic filing. The court does not need to precisely answer that question because under any framing, courthouse news has not carried its burden. It introduced no evidence, either historic or present, about any courts in 40 of the 50 states, and it covers courts in all 50 states. It did not introduce that evidence because the available record evidence is that state courts have traditionally had a person review complaints. Isn't there evidence that historically it's been the same day? Not in 40 of the 50 states, no. Courthouse news addressed specifically only 10 states, and we've walked through the Girdner Declaration in our briefing. Mr. Girdner made a few general assertions, but he then listed 10 specific states that he contended met courthouse news' standard and did not address any of the courts in the other 40. I would also note, with respect to Mr. Girdner's suggestions about timeliness, that in the examples of courts he contended made complaints available faster in paper filing, courthouse news had access to fewer than half of complaints same day in seven of the 12 he mentioned. Thank you. All right, we will reserve decision. Thank you both.